UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WALDEMAR BERENGUER**, <br><br> Plaintiff, <br><br> v. <br><br> **UNIVERSITY LEGAL SERVICES, INC.**, <br><br> Defendant. | Civil Action No. 19-cv-3591 |

### MEMORANDUM OPINION

Plaintiff Waldemar Berenguer rose from accountant to Chief Financial Officer at Defendant University Legal Services. He enjoyed an amicable working relationship with his direct and only supervisor, Jane Brown, for nineteen years. In 2016, Plaintiff began to suffer from multiple medical conditions that inhibited his ability to work consistently. Four years later, Defendant fired him and Plaintiff sued, bringing claims for hostile work environment, disability discrimination, retaliation, and failure to accommodate. Defendant now seeks summary judgment on each count of Plaintiff's Third Amended Complaint. Def's Mot. for Summ. J. at 1–23, ECF No. 40-1 ("Def.'s Mot.").

Because a reasonable jury could find that Plaintiff experienced a hostile work environment, the court will DENY Defendant's motion for summary judgment on Count II. The court also finds that Plaintiff adduced sufficient evidence that Defendant discriminated against him based on his disability, and will therefore DENY Defendant's motion for summary judgment on Count I. Because Plaintiff has not proffered sufficient evidence to raise a retaliatory pretext, the court will GRANT Defendant's motion for summary judgment on Count III. And because a genuine dispute

of material fact exists regarding when and if Plaintiff made an accommodation request, the court will DENY Defendant's motion for summary judgment on Count IV.

## I. BACKGROUND

The court recounted the factual background of this case in its prior Opinion denying Defendant's motion to dismiss Plaintiff's First Amended Complaint. *Berenguer v. Univ. Legal Servs., Inc.*, No. 19-cv-3591, 2022 WL 1684942, at *1–2 (D.D.C. May 26, 2022). It will therefore only restate facts pertinent to this decision.

### A. Factual Background

In 1997, Plaintiff, who is from Puerto Rico, began working as an accountant at University Legal Services ("ULS"), a nonprofit organization providing legal and advocacy services to the District of Columbia's low-income and disabled communities. Def.'s Stmt. of Undisputed Material Facts ¶¶ 1, 4, ECF No. 40-2 ("Def.'s SUF"); Pl.'s Stmt. of Facts ¶ 3, ECF No. 41-1 ("Pl.'s SOF"). ULS eventually promoted Plaintiff to Chief Financial Officer. Def.'s SUF ¶ 4; Pl.'s SOF ¶ 3. ULS Executive Director Jane Brown was Plaintiff's supervisor the entire time he worked there. Decl. of Jane Brown at ¶ 3, ECF No. 40-3 ("Brown Decl."); Pl.'s SOF ¶ 4. Plaintiff and Brown worked well together for nearly nineteen years. Def.'s Mot. at 2 (Brown describing her working relationship with Plaintiff as "amicable"); Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 6, ECF No. 41 ("Pl.'s Opp'n") (Plaintiff describing their working relationship as "good" for nineteen years); Pl.'s Ex. B, Dep. of Jane Brown, at 12:19–22, 13:1–6, ECF No. 41-3 ("Pl.'s Ex. B") (Brown describing her work relationship with Plaintiff as "good"); Pl.'s Ex. E, Brown Ltr., at 1, ECF No. 41-6 ("Pl.'s Ex. E") (Brown describing Plaintiff as "an honest, trustworthy, and a kind Christian man").

In 2016, Plaintiff began suffering from multiple medical conditions, including diverticulitis, that affected his major life functions, such as sleep. Def.'s SUF ¶ 19; Pl.'s SOF

¶¶ 9–10. As a result, he started to miss work. Def.'s SUF ¶ 18; Pl.'s Resp. to Def.'s Stmt. of Undisputed Material Facts ¶ 20, ECF No. 41-1 ("Pl.'s Resp.").

The parties dispute when Brown had notice of Plaintiff's disability and whether that notice constituted an accommodation request. Plaintiff claims that he always gave notice as far in advance as possible about when he would be out and told Brown of his medical issues. Pl.'s Resp. ¶ 20. For example, he would leave a voicemail and call his assistant or the front desk if he could not reach her. *Id.* ¶ 18. He recounts two meetings with Brown in 2016 in which he told her that he was suffering from diverticulitis, and that his absences were due to medical appointments. Pl.'s SOF ¶¶ 13–14. He claims that he requested accommodation at those meetings, first, by asking Brown for permission "to take some days off to be able to attend medical appointments," Pl.'s Resp. ¶ 28; and second, by telling Brown that he would "stay late and work on weekends" so that he could perform his job while dealing with his medical issues. Pl.'s SOF ¶ 14.

According to Brown, however, Plaintiff was less than forthright in 2016. She testified that Plaintiff was often unexpectedly out of the office or would leave without notice, sometimes not showing up for several days at a time. Def.'s SUF ¶ 18. He would announce that he would be out on the same day. *Id.* ¶ 20. He vaguely claimed that he was "sick" and had "medical appointments" but refused to share any further medical information. Brown Decl. ¶ 9. He never attempted to consult her about these absences and how they might impact work deadlines, nor did he explain the reasons for his absences so that Brown could properly track them. *Id.*

Brown further testified that Plaintiff did not tell her about his diverticulitis until January 2017, Def.'s SUF ¶ 21; and did not provide any documentation regarding his medical appointments or medical conditions until 2019. *Id.* ¶ 47; Brown Decl. ¶ 17. She claims that she did not learn that Plaintiff's health started to fail in 2016 until she was deposed in this matter. Def.'s Mot. at 3.

Plaintiff did not receive a raise from 2016 to 2019. Def.'s SUF ¶¶ 16–17; Pl.'s Resp. ¶ 17. Brown was the person responsible for making decisions regarding compensation. Brown Decl. ¶ 5 (declaring that she "may provide an annual salary increase to individual employees"); Pl.'s SOF ¶ 19 (attesting that Brown makes salary decisions). Although the parties dispute the factors used to determine whether an employee receives a raise, they agree that raises were neither automatic nor universal. Def.'s SUF ¶ 15 (ULS workplace policy is that "employees are not automatically entitled to annual salary increases"); *see* Pl.'s SOF ¶ 20 (stating that "a majority of ULS staff get salary increases every year"); *but see* Def.'s SUF ¶ 17 (Brown attesting that Plaintiff did not receive a raise in FY 2016-17 because of his insubordination and uncooperativeness or in FY 2017-19 because of budgetary constraints); Pl.'s SUF ¶ 21 (Plaintiff attests that the "primary reasons" for denying a ULS employee a raise are: 1) the length of time a staff member had worked at ULS; and 2) whether the particular grant on which the employee worked had enough money).

In 2017, Plaintiff and Brown had several workplace disputes. Plaintiff was hospitalized on January 31 for diverticulitis pain and informed Brown by email. Pl.'s SOF ¶ 15; Pl.'s Ex. G, Plaintiff's January Email to Brown, at 1–2, ECF No. 41-8 ("Pl.'s Ex. G"); Def.'s Resp. to Pl.'s SOF at 1–2, ECF No. 43-1 ("Def.'s Resp.") (undisputed).[1] Brown left Plaintiff a voicemail that same day telling him that "unless you are on your deathbed . . . I need to see you in here." Pl.'s SOF ¶ 16; Def.'s Resp. at 1–2 (undisputed). In April, Plaintiff took five days of bereavement leave during which he travelled to Puerto Rico. Pl.'s SOF ¶ 24; Def.'s Resp. at 1–2 (undisputed). Brown reprimanded him for taking more than three days of leave, even though the ULS handbook permits five days for an out-of-town funeral. Pl.'s SOF ¶ 24; Pl.'s Ex. L, April 2017 emails from Plaintiff

---

[1] *Neal v. Kelly*, 963 F.2d 453, 456–57 (D.C. Cir. 1992) ("[A]ny factual assertion in [a party's] affidavits will be accepted by the [court] as being true unless the [opposing party] submits his own affidavits or other documentary evidence contradicting the assertion.").

to Brown, at 2–3, ECF No. 41-13 ("Pl.'s Ex. L") (showing Plaintiff's contemporaneous recollection of April 3, 2017, when Brown came into his office and told him that he should only be taking three days of leave); Def.'s Resp. at 1–2 (undisputed); Def.'s Ex. A, ULS Employee Policy Handbook, at 18, ECF No. 40-4 ("Def.'s Ex. A") (stating that employees can take up to five days for non-local bereavement leave).

The workplace disputes continued in 2018. Plaintiff claims that in February, Brown threw a bottle of medication at him after he told her that he needed to leave work early because he was feeling ill. Pl.'s SOF ¶ 26. Defendant denies that the incident occurred, but did not present any evidence to the contrary. Def.'s Resp. ¶ 26. In May, Brown began reminding Plaintiff that his use of comp time was limited to seven hours per month. Def.'s SUF ¶¶ 27–28; Pl.'s Resp. at 1–4 (undisputed). In October, Brown reprimanded Plaintiff for an email he sent to another ULS employee about a timesheet error the employee had made. Def.'s SUF ¶¶ 35–39; Pl's SOF ¶ 31.

Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") on December 14, 2018, alleging discrimination based on sex, national origin, and disability, and a hostile work environment. Pl.'s Ex. Q, Charge of Discrimination, at 1–3, ECF No. 41-18 ("Pl.'s Ex. Q").

In March 2019, Brown began requiring Plaintiff to submit medical documentation in support of his requested sick leave. Def.'s SUF ¶ 21; Pl.'s SOF ¶ 33; Pl.'s Ex. R, March Emails between Plaintiff and Brown, at 1, ECF No. 41-19 ("Pl.'s Ex. R"). Brown did not, however, deny Plaintiff's requested medical leave. Def.'s SUF ¶ 23; Pl.'s Resp. ¶ 23 (undisputed).

In April 2019, following an EEOC mediation, Brown emailed Plaintiff about work accommodations. Def.'s SUF ¶ 43; Pl.'s Resp at 1–4 (undisputed). In May, Brown again asked Plaintiff to inform her when he would be absent or late due to medical reasons. On the days he

would be late, he was also to specify when he expected to arrive and whether he intended to make up for lost hours. Def.'s SUF ¶ 25; Pl.'s Resp at 1–4 (undisputed). In September 2019, ULS held an iPad Mini raffle. When Plaintiff's name was selected, Brown refused to give him the iPad and gave it to a different employee. Def.'s SUF ¶¶ 30–34; Pl.'s SOF ¶ 25.

On July 26, 2019, Plaintiff amended his EEOC charge to replace his national origin and sex discrimination claims with a retaliation claim. Def.'s Ex. H, Charge of Discrimination, at 1–2, ECF No. 40-5 ("Def.'s Ex. H"). On August 29, the EEOC issued Plaintiff a Right to Sue Letter. Def.'s SUF ¶ 42.

Between July 30 and September 6, 2019, Plaintiff took thirty-nine days of leave under the D.C. Family and Medical Leave Act. Def.'s SUF ¶¶ 53–54; Pl.'s Resp. at 1–4 (undisputed). He returned to work for a few weeks, until September 30, when he again requested leave until November 23, attaching a doctor's letter showing that he continued to suffer from major depression and generalized anxiety. Def.'s SUF ¶ 58–59; Pl.'s Resp. at 1–4 (undisputed). ULS approved the request. Def.'s SUF ¶ 60; Pl.'s Resp. at 1–4 (undisputed).

On November 25, Plaintiff emailed Brown, attaching a letter from a physician's assistant, stating that he should be excused from work until December 2. Def.'s SUF ¶¶ 61–62; Pl.'s Resp. at 1–4 (undisputed). On December 2, Plaintiff emailed Brown again, attaching another letter from a different physician, explaining that he should be excused from work until further notice. Def.'s SUF ¶ 62; Pl.'s Resp. at 1–4.

On December 4, Brown asked Plaintiff to have his doctor submit an "Americans with Disabilities Act Medical Certification for Accommodation" form. Def.'s SUF ¶ 63; Pl.'s Resp. at 1–4 (undisputed). In that form, Plaintiff's physician, Dr. Jimenez, who had recommended that Plaintiff be excused from work indefinitely, reiterated that Plaintiff suffered from "permanent

medical restrictions and is unable to work until further notice." Def.'s SUF ¶ 65; Pl.'s Resp. at 1–4 (undisputed). ULS fired Plaintiff on February 10, 2020. Def.'s SUF ¶ 66; Pl.'s Resp. at 1–4 (undisputed).

### B. Procedural History

Plaintiff filed this suit in November 2019, and his First Amended Complaint in February 2020. ECF Nos. 1, 6. Defendant moved to dismiss all but Count VI of that Complaint. ECF No. 8. On May 26, 2022, the court denied that motion. *Berenguer*, 2022 WL 1684942, at *2–4. On July 26, 2022, Plaintiff filed a Second Amended Complaint, bringing three counts—hostile work environment, retaliation, and failure to accommodate. ECF No. 26.

On August 7, 2022, the court granted the parties' joint motion for mediation. ECF Nos. 27–28; Min. Order Aug. 7, 2022. In November, however, at the parties' request, the court set a discovery and summary judgment briefing schedule. ECF Nos. 29–30. In June 2023, the court granted Plaintiff's motion to amend his Complaint for a third time, adding a claim for disability discrimination. ECF No. 36; Min. Order Jun. 14, 2023. Each claim of the Third Amended Complaint is brought under the Americans with Disabilities Act ("ADA") and the D.C. Human Rights Act ("DCHRA"). Third Amend. Compl. ¶ 1, ECF No. 36-1. ("Third Amend. Compl.").

Defendant moved for summary judgment in July 2023. ECF No. 40.

## II. LEGAL STANDARD

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56(a), courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  fact is material if "a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* (quoting *Anderson*, 477 U.S. at 248).  The party seeking summary judgment bears the initial burden to provide evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### III. ANALYSIS

#### A. Hostile Work Environment (Count II)

Defendant does not dispute that the ADA permits a hostile work environment claim. "Although this circuit has not resolved the question, four circuits have found that hostile work environment claims are available under the ADA." *Floyd v. Lee*, 968 F. Supp. 2d 308, 328 n.4 (D.D.C. 2013); *see also Lanman v. Johnson Cnty.*, 393 F.3d 1151, 1155 (10th Cir. 2004); *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 719 (8th Cir. 2003); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001); *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 232 (5th Cir. 2001).

Instead, Defendant challenges whether its alleged conduct constitutes a hostile work environment.  Def.'s Mot. at 6–11.  To prevail on such a claim, Plaintiff must establish that he was subjected to "'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Courts look to "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)); *Nicola v. Wash. Times Corp.*, 947 A.2d 1164, 1173 (D.C. 2008) (establishing a similar test under the DCHRA).

Plaintiff argues that numerous incidents between 2016 and 2019 establish his hostile work environment claim. Pl.'s Opp'n at 6–10. The court agrees that, viewed in its entirety, Plaintiff's evidence is sufficient for a reasonable jury to find that Defendant subjected Plaintiff to a hostile work environment.

A hostile work environment claim that "consists of several individual acts" may "become actionable due to their 'cumulative effect,'" but those actions "must be 'adequately linked' such that they form 'a coherent hostile environment claim.'" *Baird v. Gotbaum*, 792 F.3d 166, 168 (D.C. Cir. 2015) (citation omitted). To determine whether individual acts are adequately linked, the court considers the frequency of the individual acts and whether they involve the same managers and the same kind of employment actions. *Id.* at 169.

Denying a request for "medical leave," for example, can support a hostile work environment claim. *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006). Indeed, if an employer takes a "number of actions detrimental" to a plaintiff after they request leave, summary judgment on a hostile work environment claim may be denied. *Sims v. District of Columbia*, 33 F. Supp. 3d 1, 14 (D.D.C. 2014) (denying a defendant's summary judgment motion on a hostile work environment claim when, over eight months, the defendant acted in an abusive manner, including denying a plaintiff's requested leave); *Singletary v. District of Columbia*, 351 F.3d 519, 528 (D.C. Cir. 2003) (noting that it is for the district court to decide whether such a pattern of ongoing harassment exists).

The record contains sufficient evidence from which a jury could find that Brown repeatedly pressured Plaintiff to return to work while he was on medical leave, subjecting him to an abusive working environment. For example, Brown testified that beginning in 2016, she repeatedly "expressed frustration" at Plaintiff's "excessive" absences despite acknowledging that Plaintiff

had sufficient accrued leave for his medical appointments. Pl.'s Ex. B at 86:10, 88:1; *see also id.* at 86-92:1–22. Brown added that in 2016, she would ask Plaintiff, and only Plaintiff, to report to her each time he would return from his doctor's appointments. *Id.* at 106:17–22; 107:1–13. Furthermore, Brown often reminded Plaintiff that he needed to seek her approval if he wanted to use more than seven hours of leave per month. Def.'s SUF ¶¶ 23, 28; Pl.'s Resp. ¶¶ 23, 28 (undisputed). And in 2019, Brown began requiring Plaintiff to submit medical documentation whenever he used sick leave, which she had not previously done. Def.'s SUF ¶ 25; Pl.'s Resp. at 1–4 (undisputed).

In addition to those repeated actions, three specific incidents bolster Plaintiff's hostile work environment claim. First, in January 2017, after Plaintiff notified Brown that he was in the hospital because of his diverticulitis, Brown left him a voicemail stating that "[u]nless you are on your deathbed . . . I need to see you in here." Pl.'s SOF ¶ 16; Def.'s Resp. at 1–4 (undisputed). A few months later, in April, Plaintiff took five days of bereavement leave to travel to Puerto Rico. Pl.'s SOF ¶ 24; Def.'s Resp. at 1–4 (undisputed). Brown came to Plaintiff's office and told him that his timesheet, reflecting five days of leave, was incorrect, and that he was only permitted three days of leave. Pl.'s Ex. L at 1–2. After Plaintiff reminded Brown by email that ULS policy permits five days of leave for out-of-town travel, Brown relented: "I skimmed the manual and re-read it after you mentioned it was 5 days for out of town. Your timesheet remains as you wrote it." *Id.* at 1.

Second, in September 2017, Plaintiff won an iPad Mini in a company raffle, but Brown removed him from the raffle so that a different employee would receive the iPad. Def.'s SUF ¶¶ 30–34; Pl.'s SUF ¶ 25. Brown claims that she did so because Plaintiff had previously won an iPad gifted to the company by its copy vendor. Def.'s SUF ¶ 31. Plaintiff disputes this assertion.

Pl.'s Resp. ¶ 31.  Viewed in totality with the other incidents, the public denial of a raffle prize could support a finding of the "cumulative" harm contributing to a hostile work environment. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

Third, Plaintiff also claims that in February 2018, Brown threw a bottle of medication at him when he told her he needed to leave early because he was feeling ill.  Pl.'s SUF ¶ 26.  Physical violence may be associated with creating a hostile work environment.  *Simms v. Ctr. for Corr. Health & Pol'y Stud.*, 794 F. Supp. 2d 173, 193 (D.D.C. 2011) (denying summary judgment where plaintiff alleged an incident in which the employer "accosted" her in the hallway, "grabb[ed] her arm," and "pull[ed] her toward him").

Defendant disputes that this incident occurred for the first time in its reply brief.  Def.'s Reply at 5–6, ECF No. 43.  This position undermines its contention that there are no disputed issues of material fact.  *Celotex*, 477 U.S. at 323 (emphasizing that it is Defendant's burden to prove that no genuine dispute of material fact exists if it moves for summary judgment).  To be sure, it is unclear whether Defendant's assertion creates a *genuine* dispute.  *Anderson*, 477 U.S. at 254 ("[T]here is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find" that a factual issue occurred.).  The portion of Brown's deposition that Defendant references as disputing whether the event occurred does not address the medication-throwing incident.  Pl.'s Ex. B at 14:20-16:6.  Brown testified that she kept a "big bottle of ibuprofen" on her desk "near [her office] door" for staff to use.  *Id.* at 15:4–5.  She neither admitted nor denied throwing the bottle.  But resolving all inferences in Plaintiff's favor, the court nonetheless concludes that this incident creates a genuine dispute of material fact, which further supports denying summary judgment.  Fed. R. Civ. Pro. 56(a) (stating that summary judgment is only appropriate where no genuine dispute of material

fact exists); *Lane v. District of Columbia*, 887 F.3d 480, 487 (D.C. Cir. 2018) ("In determining whether a genuine issue of material fact exists, the court must view all facts, and draw all reasonable inferences, in the light most favorable to the party opposing the motion." (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

The facts here differ from cases in which the D.C. Circuit affirmed summary judgment on a hostile work environment claim. In *Baloch*, for example, the Circuit found that "none of the comments or actions directed at Baloch expressly focused on his" protected characteristic; he did not experience "tangible workplace consequences, whether financial, physical, or professional"; and the evidence did not reflect "pervasive and constant abuse," but rather, sporadic "verbal clashes with his supervisor." 550 F.3d at 1201.

Defendant insists that Plaintiff was appropriately reprimanded for not complying with the company's medical leave policy. Def.'s Mot. at 8–10. But there is evidence in the record that Plaintiff was subjected to more than traditional workplace discipline. Plaintiff asserts that over three years, Brown repeatedly requested medical documentation to substantiate his medical leave, expressed frustration towards him for taking such leave, required him to report in person regarding when he would return to work, left a threatening voicemail, questioned his use of bereavement leave, and threw a prescription bottle at him after he told her that he was feeling ill. *See Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 84 (D.D.C. 2013) (emphasizing that a "close temporal relationship may support an inference of causation in a hostile work environment claim and may assist courts in determining which actions are part of the alleged hostile work environment). Consequently, the court will deny summary judgment on Count III.

### B. Disability Discrimination (Count I)

Defendant argues that Plaintiff has not shown that he was subjected to any adverse action or that the company had animus toward him because of his disability. Def.'s Mot. at 11–16.

The discriminatory acts upon which Plaintiff relies in opposing summary judgment are different than those he alleged in his Complaint. In his Third Amended Complaint, Plaintiff alleged that Brown questioned his medical condition, threw her medication at him, told him he did not need to see a doctor, and required him to provide more detailed medical documentation than normal to take sick leave. Third Am. Compl. ¶¶ 59, 61. But Plaintiff does not rely on those allegations in his opposition. Instead, he argues, for the first time, that Defendant discriminated against him by failing to increase his salary and by limiting his compensatory time. Pl.'s Opp'n at 10–15.

Plaintiff has amended his complaint three times; the court cannot allow him to further amend by way of his opposition brief, four years after he filed suit. *Bode & Grenier, LLP v. Knight*, 808 F.3d 852, 860 (D.C. Cir. 2015) (collecting cases and affirming a denial of a motion to amend under Federal Rule of Civil Procedure 15 because it "arrived four years after litigation began"). The court will therefore not consider Plaintiff's arguments based on his allegations regarding his salary and compensatory time.

As for the remaining allegations in Plaintiff's Complaint, Plaintiff does carry his burden to show that Defendant had a discriminatory pretext. To establish a disability discrimination claim under the ADA and the DCHRA, "a plaintiff must allege: (1) that []he is qualified under the Acts; (2) that []he is excluded from participation in or has been denied the benefits, services, programs, or other activities for which the defendants are responsible or that []he was otherwise discriminated against; and (3) the exclusion, denial, or discrimination was by reason of [plaintiff's] disability." *Wheeler v. American Univ.*, 619 F. Supp. 3d 1, 18 (D.D.C. 2022) (internal quotation marks and citation omitted); *Reid-Witt ex rel. C.W. v. District of Columbia*, 486 F. Supp. 3d 1, 7 (D.D.C. 2020) ("Claims under the DCHRA . . . are subject to the same standards as ADA claims.").

Under the *McDonnell Douglas* framework, once a defendant offers a legitimate, nondiscriminatory reason for its challenged actions, the burden shifts to the plaintiff to point to facts supporting a discriminatory pretext. *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015). Defendant argues that it had a right to ensure that Plaintiff "attended work consistently" and it needed the extra documentation to ensure that it could "properly track his absences from the office as annual leave, sick leave, personal leave." Def.'s Mot. at 14. The burden thus reverts to Plaintiff "to produce[] sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason" was pretextual. *Giles*, 794 F.3d at 6.

The record does permit an inference that Defendant's actions were pretext for disability discrimination. Plaintiff testified that in 2017 Brown demanded that he return to work when he was hospitalized. Pl.'s SOF ¶ 16; Def.'s Resp. at 1–2 (undisputed). Beginning in 2019, Brown only requested extra documentation for medical absences from Plaintiff, not from any other ULS employee. Def.'s SUF ¶ 21; Pl.'s SOF ¶ 33; Pl.'s Ex. R at 1. Defendant's demands increased over time as Plaintiff continued to take leave. *See, e.g.*, Def.'s SUF ¶ 25 (showing that Brown requested more medical information in 2019); Pl.'s Resp. at 1–4 (undisputed). While "[t]emporal proximity, standing alone, cannot rebut an employer's legitimate, non-discriminatory reason for an adverse employment action," Defendant's actions closely followed Plaintiff's attempts to use his medical leave. *Miles v. Howard Univ.*, 653 F. App'x 3, 9 (D.C. Cir. 2016).

Moreover, as discussed above in Section III.A, there is a dispute as to whether Brown threw a medication bottle at Plaintiff, and if so, whether it was because of Plaintiff's disability or his noncompliance with ULS's workplace policy. Pl.'s SOF ¶ 26; Def.'s Reply at 5–6; *Wheeler*, 619 F. Supp. 2d at 21 (denying summary judgment on a disability discrimination claim because there were "competing narratives" as to whether the discriminatory acts were because of Plaintiff's

disability).  "Federal law . . . does not prohibit" conduct-based disciplinary actions "so long as the individual is not being punished for the disability itself."  *Wheeler*, 619 F. Supp. 3d at 21 (internal quotation marks and citation omitted).  Plaintiff's evidence "casts at least some doubt" on whether Brown was angry over Plaintiff's compliance with ULS's workplace policy, distinct from animus about Plaintiff's disability.  *Dougherty v. Cable News Network*, 396 F. Supp. 3d 84, 103 (D.D.C. 2019) (denying summary judgment on a disability discrimination claim because Plaintiff offered evidence that the business justification for firing him raised discriminatory pretext).  The court will therefore deny summary judgment to Defendant on Count I.

### C.  Retaliation (Count III)

Plaintiff claims that between 2016 and 2019, Defendant retaliated against him when it failed to give him a raise after he disclosed his disability, requested an accommodation, and filed an EEOC complaint.  Third Amend. Compl. ¶¶ 62–67.  Defendant argues that denying a raise is not an adverse action, and that, regardless, it had a legitimate, nondiscriminatory reason to do so.  It further contends that Plaintiff has offered no evidence to the contrary.  Def.'s Mot. at 16–19.

To bring an ADA retaliation claim a plaintiff must show that he (1) "engaged in protected activity"; (2) "was subjected to adverse action by the employer"; and (3) "there existed a causal link between the adverse action and the protected activity."  *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (internal quotation marks and citation omitted).  Protected activity includes "oppos[ing] any act or practice made unlawful by [the ADA]."  42 U.S.C. § 12203(a); *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994) (outlining similar elements for retaliation claims under the DCHRA).  If a plaintiff makes out a *prima facie* case for retaliation, the claim is then subject to the *McDonnell Douglas*, 411 U.S. 792, 802–03 (1973) burden shifting framework—meaning that once a defendant has offered a nonretaliatory reason for its actions, the

burden shifts back to the plaintiff to articulate a retaliatory pretext. *See Green*, 652 A.2d at 45 (applying the *McDonnell Douglas* framework to DCHRA claims).

Regardless of whether denying a raise is an adverse action, the court finds that Plaintiff fails to establish that Defendant's failure to give him one was retaliatory. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (holding that once the employer asserts a legitimate, nondiscriminatory reason for its actions, it "has done everything that would be required . . . if the plaintiff had properly made out a *prima facie* case," so "whether the plaintiff really did so is no longer relevant"). The record shows that ten employees—including Brown—also did not receive salary increases in FY 2016, twenty-one in FY 2017, and nine in FY 2018. Def.'s SUF ¶ 16. None of those employees had a disability. *Id.* Even if, as Plaintiff suggests, most employees received raises during that period, without evidence of pretext there is no inference that Defendant retaliated against Plaintiff by denying him one. *Manua's, Inc. v. Scalia*, 948 F.3d 401, 407 (D.C. Cir. 2020) (holding that a disputed fact is immaterial if "the analysis would not be changed even if" Plaintiff's "version of events were true"). Moreover, the parties agree that raises were neither automatic nor universal. Def.'s SUF ¶ 15; *see* Pl.'s SOF ¶ 20; *see Allen v. Johnson*, 795 F.3d 34, 46 (D.C. Cir. 2015) (affirming the denial of summary judgment on a retaliation claim in part because the parties agreed on at least some of the "stated reasons for the adverse action" (internal quotation marks and citation omitted)). Given Plaintiff's failure to point to evidence in the record indicating that his lack of pay raises was connected to his protected activity, the court will grant Defendant's motion for summary judgment on Count III.

### D. Failure to Accommodate (Count IV)

To bring an ADA failure-to-accommodate claim, a plaintiff must show that: "(1) he ha[d] a disability within the meaning of the statute; (2) the defendant had notice of his disability; (3) he could perform the essential functions of the job with or without reasonable accommodation; and

(4) the defendant refused to make the accommodation." *Leiterman v. Johnson*, 60 F. Supp. 3d 166, 179–80 (D.D.C. 2014) (quoting *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 77 (D.D.C. 2012)) (internal quotation marks and brackets omitted); *Dougherty*, 396 F. Supp. 3d at 96 ("DCHRA failure to accommodate claims 'are analyzed in the same manner as an ADA . . . claim.'" (citation omitted)). "[N]otice of a disability does not ordinarily satisfy the ADA's request requirement" because it also presumes notice of "the nature of the accommodation needed to remedy" the limitations imposed by the disability. *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1372 (D.C. Cir. 2020). Rather, the notice must concern the accommodation itself, because it is an "underlying assumption" of a failure to accommodate claim. *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999).

Plaintiff testified that he met with Brown at least twice in 2016. Pl.'s SOF ¶¶ 13–14. During these meetings, he disclosed his disability and asked for an "accommodation[]" "to take some days off to be able to attend medical appointments." Pl.'s Ex. A at 93:10–12, ECF No. 41-2 ("Pl.'s Ex. A"). Plaintiff's notes of the meeting corroborate this request. Pl.'s Ex. F at 2, ECF No. 41-7. Plaintiff also testified that "every month" he "would send" Brown the "medical appointments" that he "was going to be absent for" unless there was a medical emergency. Pl.'s Ex. A at 93:20–22; 94:1.

Brown testified, however, that Plaintiff informed her of his medical condition in January 2017, Def.'s SUF ¶ 21, and that she had to email Plaintiff about setting accommodations in April 2019, following an EEOC mediation. *Id.* ¶ 43.

Because the parties dispute whether and if Plaintiff requested accommodations for his medical condition, there is a material dispute of fact, which precludes summary judgment. *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment"). Accordingly, summary judgment will be denied as to Count IV.

## IV.     CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. A corresponding order will issue shortly.

Date: September 24, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge